AMY BAKER, Respondent, v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, March 7, 1910.

1. **RAILROADS: Parties Operating Cars: Presumption.** There is a strong presumption that cars operated on the tracks of a company are operated by that company.

2. ————: **Car Striking Person on Sidewalk: Prima Facie Negligence.** The fact that a woman, standing on a public sidewalk was there injured by a street car jumping the track and running into her, makes a prima-facie case of negligence, and puts the burden on defendant to show that it was not to blame for the casualty.

3. ————: ————: ————: **Sufficient Defense.** Proof that the act of a servant operating a car was without authority and without the knowledge of the master would constitute a legal defense to a claim for injuries for the negligent operation of the car.

4. ————: ————: ————. Even though one of defendant's cars was being operated by defendant's barn men and not by regular car operators, yet if the defendant permits them to operate the car, or if, knowing they are operating it defendant fails to stop them when it could do so, by the exercise of due care, it is responsible for their negligent acts.

5. **DAMAGES: Excessive.** Under the evidence in this case the damages allowed by the jury were not excessive.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

AFFIRMED.

*John H. Lucas* and *C. S. Palmer* for appellant.

(1) The peremptory instruction asked by defendant should have been given. Defendant's employee operating the car which injured plaintiff was acting outside the scope of his authority and could not create a liability against the defendant. Bequette v. Railroad, 86 Mo. App. 601; Sherman v. Railroad, 72 Mo. 62; Evans v. Automobile Co., 121 Mo. App. 266; Daniel v. Railroad, 48 S. C. 816, 136 N. C. 517; Brown v. Engineering Co., 43 N. E. 1118, 166 Mass. 75; Railroad v. Little, 67 Ohio St. 91, 65 N. E. 861; Jones v. Packet Co., 43 Mo. App. 398; Farber v. Railroad, 116 Mo. 81; Farber v. Railroad, 32 Mo. App. 378. (2) The verdict was excessive. Foley v. Traction Co., 55 Atl. 803; Railroad v. Wiswell, 68 Ill. App. 443, affirmed 48 N. W. 407; Vaughn v. Cement Co., 112 N. Y. Supp. 240.

*Boyle & Howell* for respondent.

(1) The plaintiff was entitled to recover and the court did not err in refusing to give defendant's peremptory instruction in the nature of a demurrer to the evidence. Williamson v. Transit Co., 202 Mo. 376; Ephland v. Railroad, 137 Mo. 187; Douglass v. Stevens, 18 Mo. 362; Perkins v. Railroad, 55 Mo. 201; 1 Shearman & Redfield, Negligence, sec. 148; Malacek v. Railroad, 55 Mo. 201; Berry v. Railroad, 124 Mo. 223; Eckhard v. Railroad, 190 Mo. 593. (2) The plaintiff having proved a prima-facie case, the trial court cannot, as a matter of law, say that it was overthrown. The plaintiff was entitled to have the judgment of the jury on the credibility of the witnesses produced by defendant and the value of their testimony. Boone v. Railroad, 20 Mo. App. 232; Gibson v. Zimmerman, 27 Mo. App. 967; Kenny v. Railroad, 80 Mo. 573; Gregory v. Chambers, 78 Mo. 298; Steamboat, City of Memphis, v. Mathews, 28 Mo. 248; Rundle v. Railroad, 65 Mo. 334; Bradford v. Rudolph, 45 Mo. 426; McAfee v. Ryan, 11

Mo. 365.   (3)   An emergency was created by the blockade or layout on the line, and Walker was led to believe, by the acts of the company in having him run cars over the same route on former occasions, that it was his duty to break the layout and take the car on to the end of the line.   Ephland v. Railroad, 137 Mo. 157; 1 Shearman & Redfield, Negligence, sec. 148; Bequette v. Railroad, 86 Mo. App. 601.

JOHNSON, J.—This suit is for damages for personal injuries.   Plaintiff prevailed in the trial court and the cause is here on the appeal of defendant from a judgment of five thousand dollars.

The injury occurred about eight o'clock in the evening of February 27, 1908, at the corner of Eighteenth street and Jackson avenue in Kansas City.   One of defendant's electric street car lines runs east on Eighteenth street to Jackson avenue where it turns south and continues on, some sixteen blocks, to its eastern terminus at Twenty-fourth and Brighton streets. Plaintiff, a seamstress fifty-one years old, went to the northwest corner of Eighteenth street and Jackson avenue, a regular stopping place, and waited for a westbound car, intending to board it as a passenger.   While standing on the sidewalk, a car came north on Jackson avenue at such high speed that it jumped the track at the curve, ran into and injured plaintiff and collided with a telephone pole, killing the motorman.   The principal defense is that the crew in charge of the car were not in the service of defendant at the time, but were trespassers, running the car without authority. The western terminus of the Jackson avenue line was at Eighteenth street and Quindaro boulevard in Kansas City, Kansas Car barns were operated by defendant at Eighteenth and Olive streets, which is eighteen blocks east of Jackson avenue.   Word came by telephone to the barn that a disabled car was coming from the west and orders were given the night foreman to run out another

car and have it in readiness to take the passengers of the disabled car and complete the run to the end of the line and back. It was the duty of the crew of the disabled car to take the substituted car, but for some reason not disclosed, they failed to do it. The car was run out by men employed in the barn; passengers were transferred, the car stood waiting until other east-bound cars arrived and were blockaded, and the belated passengers were showing impatience. In this situation, two of the barn men, who had run the car about a block east of the barn, concluded to break the blockade. One of them took the station of the motorman, the other that of the conductor and, without orders from the superintendent or foreman, ran the car to the end of the line. About five minutes after the car started, the foreman learned that the car had not gone out in charge of the crew of the disabled car. We quote from his cross-examination:

"Q. Why didn't you send this motorman and conductor that came off of this car that was turned into the barn on after this car, for them to bring it back . . . A. Well, I didn't think it was necessary. Q. Why? A. Because I didn't know but what maybe some of the train men had done that, had taken that car on out, wasn't working, was off duty. Q. You knew the situation then, didn't you? A. Well, I didn't know who had taken the car, really, at all. Q. In other words, you thought you would take your chances on whoever took the car getting it back, did you? . . . A. Well, I supposed whoever took the car away would bring it back. Anyway, I didn't suppose anybody would take the car who wasn't competent to run a car."

On the return trip, the car stopped at Twenty-fourth and Spruce streets and was boarded by a car repairer named Glenn, who had been working at the barn, had helped get out the car and evidently had come out for the express purpose of running the car back to the barn. He went at once to the motorman and said,

"I will take the car in." The motorman replied "All right," and surrendered his post. Glenn then performed the duties of motorman in operating the car and when it jumped the track, he was killed in the wreck.

Defendant's witnesses testified that Glenn was not ordered to go for the car and that he acted without authority in what he did, but the man whom Glenn relieved as motorman and who was introduced as a witness by defendant, testified that Glenn not only was at the barn, but gave orders respecting the movement of the car. He testified:

"Q. Glenn was there in charge, wasn't he and told you to do that? A. I couldn't say that he was in charge. He was there and asked me if I would pull it over, which I did. Q. You did it in obedience to his instructions? A. I did it just simply for the interest of the company more than anything else. Q. Did you do it because he told you to? A. Well, probably I did. . . . Q. State whether or not he (Glenn) did, whether he was in charge of the men to start the crews out on the road. A. No, sir. I don't think so. . . . Q. I want to know if you know. A. Well, I couldn't say. Probably in the absence of the foreman he might have given orders. . . . Q. Do you know whether Glenn's day's work was done, whether he was off duty that night when he was talking to you? A. Why I don't believe it was. . . . Q. Was he a day man or a night man? A. A night man."

The two men who defendant claims ran the car without authority were not discharged from the service of the company. The rule is invoked by defendant that "to make the master liable for the tortious act of his servant, the act causing the injury must have been in the line of the servant's duty and within the scope of his employment." [Sherman v. Railroad, 72 Mo. 62.] That rule is well settled and has been applied in this State in numerous cases. If we thought the evidence disclosed as a matter of law that Glenn was

acting without authority and beyond the scope of his employment when he injured plaintiff, we would agree with defendant that the demurrer to the evidence should have been sustained, but we do not think there is any substantial evidence to show the car was being run without authority. There is a strong presumption that cars operated on the tracks of a street railway company are being run by the authority of the company and not by strangers or by employees acting beyond the scope of their duties. When plaintiff showed that she was on the public sidewalk, where she had a right to be, and was injured by the derailment of defendant's car running on a railway track owned and operated by defendant, she made out a prima-facie case of negligence on the part of defendant and cast the burden on defendant to show that the derailment was not due to negligence but to unavoidable accident or to some cause beyond its control. Among such causes would be the act of servants who, without authority so to do, and without the knowledge of the master, committed an excess with instrumentalities belonging to the master.

The evidence of defendant tends to show that the men who started with the car, though actuated by a desire to perform a meritorious service for their employer, acted without an order from their superior officer, but we find as a matter of law that defendant, by its own showing, is in no position to repudiate their voluntary service. In five minutes after the car started on its round trip of five miles or more over the public streets of a large city, defendant knew that some of its employees were acting as the self-constituted crew of the car. This knowledge imposed on defendant the duty of making an election between suffering the car to make the round trip unmolested or of making a reasonable exertion to recapture it. Defendant could not repudiate the acts of its servants and do nothing to stop them from running a dangerous vehicle through

the public streets. By merely throwing a switch, it could have shut off the power and stopped the car, or it could have sent a crew in pursuit on another car. If the foreman, thinking the car was in competent hands, concluded to permit it to make the trip, that was a ratification of the act of its crew. If, on the other hand, he thought they were incompetent and did nothing to prevent them from endangering the safety of people rightfully on the streets the car would travel, that was negligence for which defendant must answer. Thus, by its own evidence, defendant must land on one of the two horns of a dilemma. Either it ratified what was done and thereby became liable for the negligence of its servant, or it negligently failed to discharge its duty to employ reasonable care to protect the public against danger from the continued use, without authority, of its track and equipment. In either event, defendant has failed to sustain its burden of showing that the derailment was due to a cause which, in the exercise of reasonable care, was unavoidable.

Objections to the rulings on the instructions have been answered in what we have said. It is argued that the verdict is excessive. The following description, in plaintiff's brief, of the injuries she sustained, finds support in the evidence: "Both knees were badly wrenched and sprained, and her left leg was broken. The injuries she sustained were very painful. The motion of her left leg is impaired. This is caused by adhesions of the ligaments at the point where it was broken. She has to stop and balance herself before she can stand or walk on that limb. Her right knee was still enlarged. A difference of an inch and a half in size of the knees—the left knee now being of normal size. In the right knee, she has synovitis—that is, an exudation down in the joint which has a tendency to solidify and stiffen the joint. The plaintiff was unable to straighten the right knee. She sustained other severe

injuries and was for five weeks confined to her bed, and afterwards for awhile used crutches. Two physicians testified that the injuries to both knees were permanent, and that her crippled condition was permanent."

Considering the fact that plaintiff's leg not only was broken but that the knee joint will be permanently affected by chronic inflammation and that the use of her leg will be greatly impaired thereby, we do not feel justified in pronouncing the verdict excessive. The injury is far more serious than that before the Supreme Court in the case of Haynes v. Trenton, 108 Mo. 123, much relied on by defendant. The jury, after seeing plaintiff, evidently believed her evidence to the effect that she is and will continue to be conspicuously crippled and able to move around only with difficulty. There is no room for thinking that in assessing her damages at five thousand dollars, the jury were influenced by passion or prejudice.

The judgment is affirmed. All concur.